IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JASON A. HIGHTOWER,

     **Plaintiff,**

v.

CITY OF COLUMBUS, et al.,

     **Defendants.**

     **Case No. 2:12-cv-437**
     **Judge Gregory L. Frost**
     **Magistrate Judge Kemp**

## OPINION AND ORDER

This matter is before the Court on Defendants' motion for summary judgment (ECF No. 67), Plaintiff's opposition to Defendants' motion (ECF No. 80), and Defendants' reply in support of their motion for summary judgment (ECF No. 83). The Court **GRANTS** summary judgment in favor of Defendants on the federal claims raised under 42 U.S.C. § 1983 and **DISMISSES WITHOUT PREJUDICE** to refiling in state court Plaintiff's pendent state-law claims.

**I.**

This is a civil rights lawsuit alleging excessive force by Columbus police officers during an incident that took place during the early morning hours of May 23, 2010. Earlier that night, Plaintiff Jason Hightower and a group of friends were at Brother's Bar, located at Vine and Park Streets in Columbus, Ohio's Arena District. At or near the bar's closing time, two of the friends—Brandon Clayton and his girlfriend Katy Miller—left Brother's Bar after they had an argument. Upon leaving the bar, Clayton was involved in a fight with Mark Aardema. During the short fight, which was captured on security video taken outside Brother's Bar, Clayton knocked Aardema to the ground with a punch to the head. Security video shows that Aardema lay unconscious on the sidewalk as Clayton hurried away from the scene of the fight.

Hightower left Brother's Bar moments after Clayton and Miller did, but he did not witness the altercation on the sidewalk. The security video shows a man, who appears to be Hightower, stepping over the fallen Aardema on the sidewalk and continuing in the same direction in which Clayton and Miller were headed. It is not disputed that Hightower was unaware that Clayton was responsible for Aardema laying on the sidewalk.

Columbus Police Officers Ben Rohaly and Defendant Sergeant James Gilbert were working special duty for Brother's Bar on that night. After a witness alerted them to the fight between Clayton and Aardema, the officers walked around the corner to where the fight occurred. Sgt. Gilbert stopped briefly to check on Aardema's condition while Officer Rohaly walked west along Vine Street to search for Clayton. Also headed westward was Hightower, who was looking for Clayton and Miller. Hightower caught up to Clayton at approximately the same time that Officer Rohaly placed Clayton against a wall and put Clayton's hand behind his back to place him under arrest.

According to Officer Rohaly, Hightower yelled "What the fuck's going on?" as he approached the spot where Officer Rohaly was trying to handcuff Clayton. (Rohaly Aff. ¶ 51, ECF No 68-2 at PageID# 246.) For his part, Hightower has testified that he asked Clayton, "What's going on?" as he approached. Regardless of what Hightower said, it is not disputed that Hightower walked up to within a few feet of Rohaly as Rohaly was in the process of placing Clayton under arrest. Not wanting to have his attention diverted from the process of apprehending Clayton, Rohaly ordered Hightower to "get back." Though it is unclear whether Hightower stopped immediately in response to Officer Rohaly's directive, it is undisputed that Hightower was either pushed or tackled by Defendant Columbus Police Officer David Mancini

from behind.  (Hightower Dep. 59, ECF No. 72-6 at PageID# 1063; Mancini Aff. ¶¶ 48-51, ECF No. 68-3 at PageID# 268.)

Officer Mancini was also working special duty at Brother's Bar during the early morning hours of May 23, 2010.  Officer Mancini was completing paperwork for an arrest in a nearby parking lot when the commotion involving Officer Rohaly, Clayton, and Hightower caught his attention.  Officer Mancini saw Hightower walking toward Officer Rohaly "in an aggressive manner" while Rohaly was arresting Clayton.  (Mancini Aff. ¶ 37, ECF No. 68-3 at PageID# 267.)  Officer Mancini saw Hightower continue to walk toward Officer Rohaly even after Rohaly told him to "get back."  (*Id.* at ¶¶ 41-42.)  Officer Mancini ran across the street to assist Officer Rohaly.  Upon reaching the scene, the 5-foot-8 Mancini pushed the 6-foot-5 Hightower with two open hands, approximately in the side of Hightower's upper torso.  According to Officer Mancini, his attempt to push the larger Hightower was ineffective and Hightower struck him with an open hand to either Mancini's upper chest or lower face.  (*Id.* at ¶¶ 56-59 at PageID# 268.)  Officer Mancini then saw Hightower close his fist and pull back his left hand as if readying to throw a punch.  (*Id.* at ¶ 62.)  Officer Mancini reacted by trying to punch Hightower first, but did not know if any of his punches landed.  (*Id.* at ¶ 64-66 at PageID# 269.)  For his part, Hightower denies punching Officer Mancini and testified that he put his hands in front of his face in an attempt to ward off Mancini's punches.  (Hightower Dep. 63, ECF No. 72-6 at PageID# 1067.)

Around the time that Officer Mancini was punching Hightower, individual Defendants Kimberly Hollander and Melissa Adkins, also Columbus Police Officers, joined the fray from

across the street.[1]  Officers Hollander and Adkins were parked in a paddy wagon near Brother's Bar moments before Officer Hollander saw Clayton punch Aardema.  When the officers ran across the street to intercept Clayton, Officer Hollander saw Hightower push Officer Mancini. (Hollander Aff. ¶ 31, ECF No. 68-4.)  Based on what they saw, Officers Hollander and Adkins headed toward Officer Mancini to assist him with Hightower.  (*Id.* at ¶ 33.)  When the two officers reached Officer Mancini, Hightower had a hold of Officer Mancini by the shirt.  (*Id.* at ¶ 34.)  Officer Hollander told Hightower to place his hands behind his back as she tried to handcuff him.  (*Id.* at ¶ 35.)  According to Officer Hollander, Hightower did not heed her commands and instead kept hold of Officer Mancini's shirt.  (*Id.* at ¶ 37.)  Officer Hollander also contends that Hightower punched Officer Mancini in the head and elbowed Hollander in the head as he drew his arm back to punch Mancini.  (*Id.* at ¶¶ 38-39.)  Officer Hollander was unable to handcuff Hightower at this time.

Meanwhile, Sgt. Gilbert, who had trailed Officer Rohaly after briefly checking on Aardema's condition, arrived at the scene in time to see Officer Mancini and Hightower engaged in a struggle.  As he approached the scene, Sgt. Gilbert "saw a movement in one of Hightower's upper limbs" and "also saw Officer's [sic] Mancini's head snap back, his body move backward, and his hat being knocked off his head."  (Gilbert Aff. ¶ 65, ECF No. 70-2, at PageID#339.) Based on what he saw, Sgt. Gilbert concluded that Hightower had struck Officer Mancini in the face or head.  (*Id.* at ¶ 66.)  By the time Sgt. Gilbert could reach the location where the altercation was happening, Officers Adkins and Hollander had already intervened to assist Officer Mancini in subduing Hightower.  Sgt. Gilbert recalls hearing a female voice yell, "Stop

---

[1] Adkins was "Melissa Gates" at the time of the incident in question and she is identified in Plaintiff's Complaint under that name.  Because the parties refer to her as "Melissa Adkins" now, the Court will do the same in this Opinion and Order.

resisting," but that Hightower "was not complying with the officer's commands and . . .was actively resisting the various efforts to control him." (*Id.* at ¶¶ 79-80 at PageID# 340.)

With three officers seemingly unable to subdue Hightower, Sgt. Gilbert withdrew his City of Columbus-issued X-26 Taser. (*Id.* at ¶ 82.) After yelling "Taser, Taser, Taser," to alert the other officers of his intention to deploy the Taser, Sgt. Gilbert released two probes into Hightower's left side. (*Id.*) This first "cycle" of the Taser did not appear effective, however; though Hightower fell to the ground after the Taser's first deployment, his arms, feet, and body continued to move and officers were unable to handcuff him. (*Id.* at ¶¶ 91-93 at PageID# 341; Hollander Aff. ¶¶ 45-48.) Sgt. Gilbert therefore concluded that the first Taser deployment was ineffective. (Gilbert Aff. ¶ 94 at PageID# 342.)

Sgt. Gilbert therefore initiated two more Taser cycles, one of which lasted fourteen seconds and the other lasting nine seconds. (*Id.* at ¶ 98 and Ex. F.) Sgt. Gilbert applied these additional Taser cycles because, in his view, Hightower was continuing to resist the efforts of Officers Mancini, Adkins, and Hollander to subdue and handcuff him. (*Id.* at ¶ 99.) Despite the second and third Taser cycles, the officers remained unable to subdue Hightower completely; they were able to get one of Hightower's hands into handcuffs, but were not able to get the other hand cuffed due to what Sgt. Gilbert believed to be active resistance on Hightower's part. (*Id.* at ¶¶ 102-103.) According to Officer Adkins, Hightower "continued to move and to fight" and "to flail and to pull his arms away from us" even after Sgt. Gilbert deployed the Taser. (Adkins Aff. ¶¶ 61-69, ECF No. 70-1.) At some point during the struggle, Adkins struck Hightower with her flashlight "about three times in the upper buttocks region." (*Id.* at ¶ 70.) The blows with the flashlight were ineffective, as Hightower continued to move in a manner that the officers

interpreted as resistance.  (*Id.* at ¶ 73.)  Also ineffective were Officer Hollander's application of "two or three knee strikes" to Hightower's "gluteal area."  (Hollander Aff. ¶¶ 55-58.)

Based on Hightower's actions and a "loud arcing sound" that he had heard during all of the Taser cycles he deployed, Sgt. Gilbert believed that he "had not obtained a good probe placement when [Sgt. Gilbert] initially deployed the taser probes into Hightower's side." (Gilbert Aff. ¶ 105.)  Accordingly, Sgt. Gilbert applied a fourth Taser cycle, which Sgt. Gilbert described as a "drive stun," to Hightower; a "drive stun" or a "close-quarter probe deployment" is when the Taser is pressed directly into the subject's body.  (*Id.* at ¶¶ 106-111.)  This "drive stun" incapacitated Hightower and enabled officers to fully handcuff him.  (*Id.* at ¶ 114.)  With Hightower finally handcuffed, the struggle ended and Hightower was placed under arrest for assault.  It is estimated that the officers' entire encounter with Hightower lasted between 50 and 70 seconds.  (*Id.* at ¶ 146.)

Not surprisingly, Hightower's account of the incident differs from that of the officers involved.  Hightower insists that he stopped immediately upon Officer Rohaly's instruction to "get back" and was about five feet away from the officer when he did so.  (Hightower Dep. 60, ECF No. 72-6 at PageID# 1064.)  Hightower denies throwing any punches at Officer Mancini, maintaining that he put up his hands only in a defensive posture in response to Mancini's punches.  (*Id.* at 63, PageID# 1067.)  Hightower also professes to know of no reason why Sgt. Gilbert deployed the Taser; according to Hightower, he was "just standing there" as the other officers on the scene were striking him and "pulling on [Hightower's] limbs."  (*Id.* at 69, PageID# 1073.)  Hightower denies that he was actively resisting the officers' attempts to subdue him, but does not know whether his body continued to move after deployment of the Taser because he "had no control over any of [his] motions."  (*Id.* at 65-66.)  During his post-arrest

interrogation by police, however, Hightower conceded that his actions in response to Officer Rohaly's command to "get back" could have been interpreted as "aggressive."  (ECF No. 69.)

A Franklin County Grand Jury indicted Hightower on two counts of felony assault for allegedly assaulting Officers Mancini and Hollander.  (ECF No. 73-12.)  Hightower stood trial and was ultimately acquitted on all charges.

Hightower filed this action in May 2012, naming the City of Columbus, Columbus Police Chief Walter L. Distelzweig, Sergeant Steven L. Livingston, and Officers Mancini, Gilbert, Hollander, and Adkins as Defendants.  Hightower alleged claims under 42 U.S.C. § 1983 claims for (1) unreasonable and excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution, (2) unlawful seizure, detention, and arrest in violation of the First, Fourth, and Fourteenth Amendments, (3) "failure to intervene" on the part of Officers Mancini, Adkins, and Hollander, (4) assault and battery, and (5) "supervisory liability" against Defendants Livingston and Distelzweig.  (ECF No. 1.)  Hightower's Complaint also pleads state-law claims for assault and battery and intentional infliction of emotional distress. (*Id.*)

Defendants move for summary judgment on Hightower's Complaint.  (ECF No. 67.) The motion is fully briefed and ripe for this Court's adjudication.

## II.

Defendants move for summary judgment on all of Plaintiff Hightower's claims. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Prods. v. United Techs. Auto.,*

*Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When viewing the evidence presented in favor of and in opposition to summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### A.  *42 U.S.C. § 1983 and Qualified Immunity—Claims Against Individual Officers*

Defendants seek summary judgment on Hightower's 42 U.S.C. § 1983 claims. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Thus, in order to assert valid § 1983 claims, Hightower must show that Defendants, while acting under color of state law, deprived him of a right secured by the Federal Constitution or laws of the United States.  *See Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003).

Plaintiff Hightower has sued a number of individual police officers in their individual capacities.  These officers invoke the defense of qualified immunity as a bar to Hightower's claims.  The doctrine of qualified immunity operates under certain circumstances to shield from civil liability governmental officials, such as police officers, who are performing official duties. *Sinick v. Summit*, 76 F. App'x 675, 679 (6th Cir. 2003). The affirmative defense shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In addition to shielding officials from liability, qualified immunity may entitle the official not to stand trial or face the other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

In addressing the potential applicability of qualified immunity, courts use a two-step analysis. First, the Court must look at "whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated"; second, the Court must determine "whether that right was clearly established" at the time of the incident in question. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *Simmonds v. Genessee Cnty.*, 682 F.3d 438, 443-44 (6th Cir. 2012). The Court need not consider these steps in order; it may consider either step first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.

When a government official raises qualified immunity within the context of a motion for summary judgment, the non-movant must respond with facts sufficient to indicate that the act in question violated clearly established law at the time the act was committed.  *Simmonds*, 682 F.3d

at 444; *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992). Thus, the plaintiff must effectively pass two hurdles when facing a defendant on summary judgment who claims qualified immunity: (1) the allegations must state a violation of clearly established law and (2) there must be evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts. *Id.* At the summary judgment stage, whether the legal violation alleged was clearly established at the time of the incident, as well as whether a genuine issue of material fact exists as to whether the alleged violation occurred, are questions of law for the court. *Id.*

### 1. Unlawful Arrest Claim Against Individual Arresting Officers

In Count II of the Complaint, Hightower alleges a § 1983 claim for "unlawful seizure, detention and arrest" against individual Defendants Mancini, Gates, and Hollander. (ECF No. 1 at PageID# 7.-8) Hightower alleges that Officers Mancini, Gates, and Hollander lacked reasonable suspicion to detain or probable cause to arrest him on the night in question. (*Id.* at ¶ 42.) Hightower also contends that the officers arrested him in retaliation for his "request for information" concerning Clayton's detention outside Brother's Bar, thereby violating his First Amendment freedom of speech rights. (*Id.* at ¶¶ 43, 46.) The Court finds that the officers are entitled to summary judgment on this claim, as Hightower cannot establish that there was a constitutional violation.

An arrest and prosecution made on probable cause does not violate the Fourth Amendment's prohibition against unreasonable search and seizure. See *Michigan v. DeFillippo*, 443 U.S. 31, 36, 61 L. Ed. 2d 343, 99 S. Ct. 2627 (1979); *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003). "In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999)).

Accordingly, if Hightower's arrest for assault on Officers Mancini and Hollander was supported by probable cause, his § 1983 claim based on a wrongful detention and arrest in violation of his Fourth and Fourteenth Amendment rights fails as a matter of law.

In this case, a state grand jury indicted Hightower on two counts of assault stemming from the incident in question.  This circumstance precludes Hightower from establishing § 1983 liability on a theory of unlawful detention and arrest. It is well settled that "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002); *see also Bakos v. City of Olmsted Falls*, 73 F. App'x 152, 157 (6th Cir. 2003) (finding that a grand jury indictment conclusively established probable cause for purposes of a § 1983 claim based upon a false arrest theory under the Fourth Amendment).

Hightower argues that the grand jury indictment is not determinative of his claim because he "is able to set forth sufficient evidence to withstand summary judgment by establishing that the indictment was produced by the suppression of evidence or other police misconduct undertaken in bad faith." (Pl.'s Opp., ECF No. 80 at PageID# 1395.)  Indeed, if a Section 1983 plaintiff is able to show it, evidence that a grand jury indictment was procured by perjured testimony or some other irregularity in the grand jury proceeding may indicate that the grand jury proceeding "was somehow tainted and therefore not entitled to a conclusive presumption that there was probable cause to support the arrest." *Bakos*, 73 F. App'x at 157; *see also Cook v. McPherson*, 273 F. App'x 421, 424 (6th Cir. 2008) (noting that an indictment is not conclusive of probable cause when the indictment is obtained wrongfully by police officers who knowingly present perjured testimony to a grand jury).  But while Hightower says he is "able" to produce

11

such evidence, he does not present *any* such evidence in opposition to Defendants' motion for summary judgment.  His failure to point to any evidence supporting his claim of grand jury irregularity precludes him from defeating the conclusiveness of the indictment as to the existence of probable cause for his arrest.  *See id.*

Hightower's First Amendment retaliatory arrest claim fares no better. "[W]here there is probable cause to file a criminal complaint, a plaintiff will be unable to prevail on [a] retaliation claim." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 604 (6th Cir. 2012).  Moreover, Hightower fails to offer any *evidence* to support the dubious claim that the individual officers arrested Hightower based on Hightower's exercise of First Amendment rights.  Citing no evidence, Hightower states simply in his response to summary judgment: "To the extent that Jason Hightower was arrested in response to his request for information concerning his friend's detention outside Brother's Bar, the arrest was based on a First Amendment constitutional violation." (ECF No. 80, at PageID# 1398.)  This is speculative argument, not the identification of evidence to support a First Amendment claim.

For these reasons, Defendants are entitled to summary judgment on Count II of the Complaint.

### 2.  Excessive Force Claims

In Count II of the Complaint, Hightower alleges a § 1983 claim premised upon the use of excessive force by the individual officers in subduing and arresting him on the night in question. Hightower alleges excessive force on the part of each officer who participated in his arrest—Sgt. Gilbert and Officers Mancini, Hollander, and Adkins.

The Fourth Amendment prohibits the use of excessive force by an arresting officer. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  To determine whether the use of force was

excessive for purposes of the Fourth Amendment, the Court must employ an "objective reasonableness" test that considers the force used under the totality of the circumstances. *Kijowski v. City of Niles*, 372 F. App'x 595, 598 (6th Cir. 2010); *see also Graham v. Connor*, 490 U.S. at 394-95. The test is "fact specific, not mechanical." *Wysong v. City of Heath*, 260 F. App'x 848, 854 (6th Cir. 2008). Relevant facts and circumstances to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Other relevant factors to consider are the duration of the action, the possibility that the persons subject to the police action are themselves violent or dangerous, the number of persons with whom the police officers must contend at the same time, and whether the action took place in the context of an arrest. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). "The standard 'contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.'" *Wysong*, 260 F. App'x at 854 (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)).

Here, Hightower alleges that Defendants Mancini, Adkins, Hollander, and Gilbert each used excessive force against him during the incident on May 23, 2010. The parties' briefing separately parses out each individual officer's actions and analyzes them separately, as opposed to analyzing the entirety of the officers' actions as a whole. In light of the parties' approach, and without deciding if this is the correct approach for every excessive force case, the Court will likewise analyze each individual officer's actions in question.

### a.  Officer Mancini: The Tackle and the Punches

Officer Mancini was the first officer to get into a physical altercation with Hightower on the night in question.  It is not disputed that Officer Mancini either shoved or attempted to tackle Hightower as Hightower approached the spot where Officer Rohaly was arresting Clayton.[2] Hightower argues that the push was excessive force under the circumstances because there was no reasonable suspicion that Hightower posed a threat to Officer Rohaly.

To be sure, there is a factual dispute with regard to what Hightower did in response to Officer Rohaly's directive to  "get back" as Hightower approached the spot where Officer Rohaly was attempting to arrest Clayton.  Defendants contend that Hightower kept walking toward Rohaly and was within the "reactionary gap," or the distance at which a subject can quickly strike an officer; thus, Defendants characterize Hightower as a threat to Officer Rohaly's safety, particularly in light of the fact that Hightower stood approximately 6-foot-5 and had a long reach.  (Defs.' Mot., ECF No. 67 at PageID# 218-19.)  Hightower, on the other hand, contends that he stopped immediately and was instantaneously shoved (or tackled) by Officer Mancini.  This factual dispute, however, is not enough for Hightower to overcome a qualified immunity defense.

It is not unreasonable for a police officer to forcibly shove a person away from the scene of an arrest.  *See Jones v. City of Jersey City*, 45 F. App'x 196, 198 (3d Cir. 2002).  As the United States Supreme Court has noted, "not every push or shove, even if it may later seem unnecessary," violates the Constitution.  *Graham v. Connor*, 490 U.S. at 396.  In this case, the absence of a Constitutional violation is particularly evident when considering that Officer

---

[2] Defendants take umbrage with Hightower's description of Officer Mancini's initial physical contact as a "tackle" rather than a "push."  Under the facts set forth by the parties' respective evidence, however, the Court finds the "tackle" versus "push" distinction to be of no moment.  Since it is undisputed that Officer Mancini did not bring Hightower to the ground with the initial "push" or "tackle," the Court sees no material difference between the two characterizations.

Mancini made the split-second decision to come to Officer Rohaly's assistance when Hightower was admittedly within a few feet from where Officer Rohaly was trying to complete his arrest of Clayton.  Coupled with Hightower's own admission during the police interview following his arrest that his movement toward Officer Rohaly's location was arguably "aggressive" (and that he could understand how an officer would interpret it as such), the Court cannot say that Officer Mancini violated any clearly established Constitutional right of Hightower.

The Court is not saying that a police officer's shove never violates the Constitution.  But Officer Mancini's shove of Hightower in this case did not rise to that level.  Whether or not there was reasonable suspicion that Hightower was going to interfere with Officer Rohaly's arrest of Clayton is beside the point.  "The essence of qualified immunity . . .  is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011)).  Even if Officer Mancini misinterpreted Hightower's actions in that moment, he did not do so unreasonably.  There was a sense of urgency when Officer Mancini observed Hightower approaching Officer Rohaly in an arguably aggressive manner while Officer Rohaly was trying to effectuate arrest.  A reasonable officer on the scene could conclude that pushing Hightower aside (or attempting to) was necessary to assist Officer Rohaly.  *See Ference v. Twp. Of Hamilton*, 538 F. Supp. 2d 785, 806 (D.N.J. 2008) (finding that a police officer's initial push was reasonable in light of the officer's reasonable determination that the person posed an immediate threat to the safety of others during a disturbance).

Hightower's physical confrontation with Officer Mancini did not end with the initial push (or attempted "tackle," as Hightower describes it).  Hightower acknowledges that, immediately

after the push, he raised his hands up, such that they were in between him and Officer Mancini. (Hightower Dep. 61, ECF No. 72-6 at PageID# 1065.)  Though Hightower characterizes this as a defensive movement, a reasonable officer could have interpreted the movement otherwise in the heat of the moment, when the movement of Hightower's hands happened so quickly (virtually immediately) after the initial push.  What's more, the Court cannot say that Officer Mancini reacted unreasonably given the undisputed fact that Hightower is much larger than he.  Under the circumstances, when faced with a larger and arguably aggressive suspect who was perceived to be interfering with an arrest a few feet away from another officer, Officer Mancini had to act quickly.  The Court cannot say that Officer Mancini violated any clearly established constitutional rights by punching Hightower when Hightower made a movement with his arms that the officer reasonably perceived to be an imminent assault upon him.  *Cf. Schliewe v. Toro*, 138 F. App'x 715, 722 (6th Cir. 2005) (finding that an officer's punch was not unreasonable even though suspect was not charged with a serious crime because "it was difficult for the officers to judge [the suspect's] intentions" under the circumstances).  The "reasonableness" of a particular use of force "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. at 396).

For these reasons, Court finds that Hightower has not created a genuine issue of material fact with respect to whether Officer Mancini committed a constitutional violation during the incident in question.  Based on the evidence of record, Officer Mancini's actions were reasonable under the totality of the circumstances.  Accordingly, Officer Mancini is entitled to qualified immunity from § 1983 liability.

### b. *Taser Cycles Deployed by Sgt. Gilbert*

Hightower also alleges excessive force in connection with the most serious form of force applied during the incident, namely, Sgt. Gilbert's use of the Taser. As it is within its discretion to do, the Court will address the second step of the qualified immunity analysis first and determine whether Hightower had a clearly established constitutional right to be free from Taser deployment on May 23, 2010. For the reasons described below, the Court finds that he did not.

As an initial matter, the Court must define the constitutional right at issue in its assessment of whether the right was "clearly established" as of May 23, 2010 for purposes of a qualified immunity analysis. On this issue, the parties differ on how to define the right. Hightower defines the constitutional right at issue generically as the right "to be free from excessive force." (Pl.'s Opp., ECF No. 80 at PageID# 1393.) In contrast, Defendants define the right in a more particularized manner, with reference to the circumstances of the incident at issue. (Defs.' Mot., ECF No. 67 at PageID# 210-11.)

The Court rejects Hightower's framing of the "clearly established" constitutional right as overly generalized. Hightower cites *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) for the proposition that the right to be free from excessive force is a clearly established right. But *Walton*'s generalized articulation of the "clearly established" right to be "free from excessive force" is no longer the correct mode of analysis when deciding the applicability of qualified immunity. As the Sixth Circuit recently admonished, "[i]n deciding whether a right has been clearly established, the Supreme Court has 'repeatedly' warned lower courts not to define the right at 'a high level of generality.'" *Hagans*, 695 F.3d at 508 (6th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. at 2084). The Sixth Circuit explained:

"The general proposition" that the Fourth Amendment prohibits police officers from using excessive force "is of little help in determining whether the violative nature of [an officer's] particular conduct [was] clearly established." *al-Kidd*, 131 S. Ct. at 2084. It is sometimes worse than that: If a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry always to answer the clearly established inquiry. Precedent demands instead that we go down the stairs of abstraction to a concrete, particularized description of the right. Though not too far down: just as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).

Examples abound of an appropriate middle ground. In an excessive-force case, that might mean asking whether "a disturbed felon, set on avoiding capture through vehicular flight [that placed] persons in the immediate area . . . at risk" had a clearly established right not to be shot. *Brosseau v. Haugen*, 543 U.S. 194, 200, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam). Or, closer to today's case, it might mean asking "whether a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command, had a clearly established right not to be tased." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012).

*Id.* at 508-09.  *See also Saucier*, 533 U.S. at 201 (noting that the inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition").

With these standards in mind, the Court frames the constitutional issue in the same manner that the Sixth Circuit did in *Hagans*.  The key to determining whether Sgt. Gilbert is entitled to qualified immunity from § 1983 liability for his use of a Taser is whether the record shows a genuine issue of material fact with regard to Hightower's active resistance (or lack thereof) to arrest.  Indeed, the Sixth Circuit has held that an individual has no clearly established constitutional right to be free from a police officer's use of a Taser when the individual is actively resisting arrest.  *See Hagans*, 695 F.3d at 509; *Correa v. Simone*, No. 11-4441, 2013 U.S. App. LEXIS 12092, at *9-10 (6th Cir. June 12, 2013).

With the constitutional issue properly framed, it becomes evident based on the record evidence before the Court that Sgt. Gilbert is entitled to invoke the defense of qualified immunity to avoid § 1983 liability.  Notwithstanding Hightower's insistence that he was not actively resisting officers' efforts to subdue and arrest him during the incident in question, the record is replete with evidence that Hightower's actions would appear to a reasonable officer to be active resistance.  The reasonableness of the officers' actions is particularly compelling in light of the short duration of the incident in question: the entire encounter with Hightower lasted between approximately 50 and 70 seconds, meaning that officers had to make extremely swift decisions about how to react to Hightower's movements and actions.

In reaching its conclusion that qualified immunity is appropriate, Hightower's own admissions during his deposition and during his post-arrest interview with police are important. Hightower acknowledges that he was "flailing" during his struggle with Officers Mancini, Adkins, and Hollander.  (Hightower Dep. 66, ECF No. 72-6 at PageID# 1070.)  Moreover, Hightower acknowledges that he was "just pretty much in a state of confusion" while the officers were "pulling on [him] from every which direction."  (*Id.* at 64, PageID# 1068.)  One of the officers yelled, "Stop resisting," but there was no immediate ceasing of movement by Hightower. (Adkins Aff. ¶ 56; Hollander Aff. ¶¶ 41-42; Gilbert Aff. ¶¶ 79-80.)  Indeed, Officers Hollander and Adkins could not gain control of Hightower to handcuff him and Hightower was not complying with commands for him to stop resisting and to place his harms behind his back. (Adkins Aff. ¶¶ 53-56; Hollander Aff. ¶¶ 35-36.)  This fast-moving series of events left Sgt. Gilbert in a position to make a split-second decision about what course of action to take in response to what appeared to be active resistance by Hightower.  Because he interpreted the situation as active resistance to arrest by a suspect, Sgt. Gilbert deployed his Taser in an effort to

subdue Hightower.  Insofar as Sgt. Gilbert's action came in response to what was reasonably perceived to be active resistance by Hightower, *Hagans* counsels in favor of qualified immunity barring Hightower's excessive force claim against Sgt. Gilbert.

Nevertheless, Hightower makes much of the deposition testimony of Candace Earnest, a third-party witness who was acquainted with Hightower.  In attempting to create a genuine issue of fact for trial, Hightower's opposition to Defendants' motion for summary judgment Earnest's testimony this way:

> Jason's account is backed up by witness Candace Ernest [sic].  She saw an officer putting their [sic] foot on Jason's back, and one kneeling on his head, pushing it into the ground, as Jason was lying on the ground.  Jason was yelling "I'm not resisting.  Just stop," but Sgt. Gilbert Tased him anyway.  Jason was begging Defendant Officers to stop Tasing him and to stop pushing on his head.

(Pl.'s Opp., ECF No. 80 at PageID# 1403 (deposition citations omitted).)

Upon closer examination, however, Earnest's testimony does not have the corroborating value that Hightower gives it.  The totality of Earnest's testimony about the incident makes it evident that Earnest did not actually witness the above-described scenario.  Earnest admitted that she (1) did *not* actually see any officer knee or kick Hightower, (2) did *not* see any officer strike Hightower with a baton, flashlight, or any other weapon, and, perhaps most importantly, (3) did *not* actually see Sgt. Gilbert deploy the Taser.  (Earnest Dep. 41-48, 73, ECF No. 80-3.) Earnest's testimony therefore is of no help to Hightower in creating a genuine issue of material fact with respect to whether Hightower was actively resisting the officers at any time, much less at the time Sgt. Gilbert used the Taser.

Nor does the expert testimony of Dr. William Gaut help Hightower overcome Sgt. Gilbert's qualified immunity defense.  Dr. Gaut has opined that the officers used excessive force against Hightower, both in the deployment of the Taser and in other respects.  (*See generally*

Gaut Aff., ECF No. 80-1.)  Even assuming the admissibility of Dr. Gaut's opinion in this case, the opinion does not help Hightower overcome summary judgment.[3]  Notably, Dr. Gaut testified at his deposition:

> If the circumstances show that Mr. Hightower was physically resisting manually to being put down on the ground or refusing to voluntarily lay down on the ground by an order, then Sergeant Gilbert's initial use of the taser would be justified.  I wouldn't have a problem with it under those circumstances.

(Gaut Dep. 175, ECF No. 92 at PageID# 1883.)

As illustrated above, however, the evidence in the record shows—at the very least—circumstances from which a reasonable officer would infer active resistance on the part of Hightower.  In a rapidly moving and volatile situation, Hightower was not immediately compliant with the officers' efforts to subdue him and was eluding the officers' efforts to handcuff him.  Hightower has not offered evidence to create a *genuine* factual dispute on the important question of whether his actions were reasonably interpreted as active resistance.  Accordingly, the Court cannot find that Sgt. Gilbert employed excessive force when he deployed the Taser.

Nor does the Court find excessive force with regard to Sgt. Gilbert's subsequent deployments of the Taser until Hightower was subdued and handcuffed.  By his own admission, Hightower was flailing and could not control his body movements after the Taser was deployed.  This admission corroborates the various officers' account that the Taser was not immediately effective in subduing Hightower.  Indeed, even after Hightower was Tased, officers were unable to immediately get him handcuffed.  Though Hightower argues that his movements were not resistance and that it was impossible for him to resist after being Tased, the officers were in no

---

[3] Plaintiff identified Dr. Gaut as an expert on police practices.  Defendants filed an untimely motion in limine to exclude Dr. Gaut's testimony at trial.  In light of the Court's ruling on the summary-judgment motion, the Court need not decide the admissibility of Dr. Gaut's testimony and simply assumes without deciding that Dr. Gaut is permitted to testify.

position to conclude that Hightower's noncompliance was due to (as Hightower argues) a physical inability to comply. *Cf. Wysong*, 260 F. App'x at 854 (noting that officers would be entitled to qualified immunity "even if [the arrestee's] resistance arose from involuntary muscle spasms brought on by diabetes"). Under these circumstances, the use of force was brief and only used to bring a seemingly non-compliant Hightower under control. *See Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010) (finding that the use of a Taser was not excessive when the suspect was not subdued after closed-fist punches to his back).

For these reasons, Sgt. Gilbert's use of a Taser on Hightower did not violate Hightower's clearly established constitutional rights. Sgt. Gilbert is therefore entitled to qualified immunity.

### c. *Adkins' Flashlight and Hollander's Knee*

During the fracas between Hightower and Officer Mancini, Defendant Officers Adkins and Hollander rushed to Mancini's assistance from a short distance away. At some point during the attempt to handcuff Hightower, Adkins struck Hightower in the "upper buttocks region" with a flashlight and Hollander applied "two or three knee strikes" to Hightower's "gluteal area." (Adkins Aff. ¶ 70; Hollander Aff. ¶ 55.)

Under the totality of the circumstances, the Court does not find a cognizable constitutional violation. At the time Adkins and Hollander used the flashlight and knee strikes, respectively, they had been unable to handcuff Hightower due to what they perceived to be non-compliance with their attempts to subdue him. Both Adkins and Hollander testified that Hightower continued to pull his arms underneath his body and up to his chest, which was reasonably interpreted as active resistance to their efforts to handcuff him. (Adkins Aff. ¶ 51; Hollander Aff. ¶¶ 65-67.) As Hightower himself acknowledged, he continued to flail about even

after the Taser was deployed, giving the impression that the Taser did not effectively immobilize him and that Hightower may have been continuing to resist.

The *Graham* excessive force factors all cut in favor of the conclusion that there was no constitutional violation.  Hightower was suspected of a severe crime (assault) and appeared to pose an immediate threat to officers in light of his size and apparent resistance.  Further, the officers observed what they reasonably construed as active resistance.  What's more, the short time frame involved here cuts in favor of a finding of reasonableness, as the officers were forced to make split-second decisions on how much force to use in a quickly developing, volatile situation.  Under the totality of the circumstances, the Court cannot say that Hightower has created a genuine issue of material fact with regard to whether an Officer Adkins' and Officer Hollander's use of force was excessive.  These officers are therefore entitled to qualified immunity.

### 3.  Failure To Intervene

In Count III of the Complaint, Hightower also asserts in a § 1983 claim premised on a "failure to intervene" theory.  The gravamen of this claim is that Officers Mancini, Adkins, and Hollander failed to prevent the use of excessive force against him.  (Compl. ¶¶ 52-55, ECF No. 1; Pl.'s Opp., ECF No. 80 at PageID# 1409.)  *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

A police officer may be held liable for a failure to intervene when the officer (1) observed or had reason to know that excessive force was or would be used and (2) the officer had the opportunity and means to prevent the harm from occurring.  *Id.*  If there is no excessive force in the first instance, there can be no liability for failure to intervene.  *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 442 (6th Cir. 2011).

This Court has already determined above that none of the individual officers named in the Complaint may be held liable for excessive force under § 1983; each of them enjoys qualified immunity.  *See* Part II.A.2, *ante*.  Accordingly, Defendants named in Count III are entitled summary judgment on Hightower's "failure to intervene" claim.

### B.  Supervisory Liability Under 42 U.S.C. § 1983

In Count IV of the Complaint, Hightower alleges "supervisory liability" against Columbus Police Sergeant Steve Livingston and former Columbus Police Chief Walter Distelzweig.  The Sixth Circuit has described the reach of supervisory liability under § 1983, which must be based on something more than a theory that supervisors are liable under the respondeat superior doctrine:

> Respondeat superior is not a proper basis for liability under § 1983. Nor can the liability of supervisors be based solely on the right to control employees or simple awareness of employees' misconduct. Furthermore, a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.

*McQueen v. Beecher Community Schools*, 433 F.3d 460, 470 (6th Cir. 2006).

A prerequisite to supervisory liability is, of course, an underlying constitutional violation.  *Id.*  Without unconstitutional conduct by a supervisor's subordinate, supervisory liability cannot exist.   Because the individual officers in this case are, for the reasons stated above, entitled to qualified immunity on each of Hightower's § 1983 claims against them, the supervisory liability claims against Sgt. Livingston and Chief Distelzweig must necessarily fail.

In any event, Hightower can point to no act by either Sgt. Livingston or Chief Distelzweig upon which to base supervisory liability even if qualified immunity were not

present here.  At a minimum, a § 1983 plaintiff claiming supervisory liability must show that the supervisor authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the subordinate.  *Id.  See also Petty v. County of Franklin*, 478 F.3d 341, 349 (6th Cir. 2007).  In this case, Hightower rests his supervisory liability claim merely on the notion that the Columbus Police Department's internal investigation (conducted by Sgt. Livingston) into the events of May 23, 2010, found no wrongdoing on the part of the officers involved.  Hightower points the Court to no other evidence of "involvement" by Sgt. Livingston and points to none at all as to Chief Distelzweig.  Nor has Hightower pointed to any authority for the proposition that an internal investigation's finding of no wrongdoing, in and of itself, can constitute the authorization, approval of, or acquiescence in unconstitutional conduct for purposes of supervisory liability under § 1983.  For these reasons, the Court grants summary judgment in Defendants' favor on the "supervisory liability" claim alleged in Count IV of Hightower's Complaint.

### C.  Federal Claims Against the City

In Counts IV and V of the complaint, Hightower also seeks to hold the City of Columbus liable under § 1983.  Since municipalities cannot be held liable under a theory of respondeat superior, Hightower must show that he suffered an unconstitutional injury due to a custom, policy, or practice attributable to the municipality.  *Heyerman v. County of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012); *see generally Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).[4]

---

[4] Hightower also purports to sue each of the named officials in the Complaint in their "official" capacities. Naming an official in his "official" capacity is nothing more than a suit against the municipality itself. *See Petty*, 478 F.3d at 349 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  Thus, the analysis of the "official" capacity claims is no different from the claims against the City of Columbus itself: Hightower must show that a City custom, policy, or practice "was the moving force behind the violation of his constitutional rights." *Id. See also Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005).

Hightower's claims against the City fail for the simple reason that he has not established a genuine issue of material fact with respect to his constitutional claims against the individual officers, as set forth above.  In other words, Hightower has failed to show any deprivation of a constitutional right in this case, thereby precluding him from imposing liability against the City itself.  *See Cartwright v. Marine City*, 336 F.3d 487, 495 (6th Cir. 2003); *Scott v Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000).

### D.  *State Law Claims*

Having found summary judgment appropriate on each of the federal claims alleged in Hightower's Complaint, all that remains are Hightower's claims under Ohio law for assault and battery (Count VI) and intentional infliction of emotional distress (Count VII).  In their motion for summary judgment, Defendants predict that this Court "will likely decline to exercise its supplemental jurisdiction over Hightower's state-law claims once the § 1983 claims are dismissed."  (Defs.' Mot., ECF No. 67 at PageID# 232.)  Defendants are correct.

Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over state-law claims where, as here, the district court has disposed of all claims over which it has original jurisdiction.  In making the decision whether to exercise supplemental jurisdiction, a district court should consider and weigh several factors, including the values of judicial economy, convenience, fairness, and comity.  *Gamel v. City of Cincinnati*, 625 F.3d 949, 951-52 (2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). When a district court dismisses all claims over which it had original jurisdiction, the balance of considerations is *likely* to weigh in favor of declining to exercise supplemental jurisdiction. *Gamel* at 952.

26

In assessing the factors of judicial economy, fairness, and comity, a district court is guided by several specific considerations. Among these are (1) whether the district court should avoid needless state law decisions as a matter of comity, (2) whether the district court, in its disposition of federal-law claim, resolved a related state-law issue, (3) whether similar predicate factual findings are necessary to resolve both the state and the federal claims, (4) whether the district court has expended significant time and resources, (5) whether dismissal or remand will result in duplicative litigation, (6) whether the matter has been on the district court's docket for a significant time, (7) whether the parties have completed discovery, (8) whether plaintiff has abandoned all federal claims at a late stage of the proceedings, and (9) whether a summary judgment motion has been extensively briefed and is ripe for review. *Ragland v. City of Chillicothe*, No. 2:10-cv-879, 2012 U.S. Dist. LEXIS 55571, at *26-27 (S.D. Ohio Apr. 20, 2012); *Fox v. Brown Memorial Home*, 761 F. Supp. 2d 718, 723-24 (S.D. Ohio 2011).

Admittedly, several of the factors cited above (namely, numbers 4, 6, 7, and 9) cut in favor of this Court's exercise of supplemental jurisdiction.  Be that as it may, factors 1 and 2 carry the day here.  The state-law claims are subject to a defense of state-law tort immunity under Ohio Rev. Code Chapter 2744.  The statutory immunity granted by state law are different than the qualified immunity granted by 42 U.S.C. § 1983; accordingly, this Court's analysis of qualified immunity did not resolve this state-law issue.  As a matter of comity, this Court will not needlessly step into the fray of resolving the remaining state-law claims and defenses.

### III.

The events outside Brother's Bar during the early morning hours of May 23, 2010 were unfortunate for Hightower.  Taking Hightower at his word, he intended no harm to the police officers and was not trying to resist arrest.  But the situation that occurred is the kind of incident

for which the doctrine of qualified immunity is designed.  Even if the Court were inclined to say the officers used more force than was necessary under the circumstances, "[t]he essence of qualified immunity . . . is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways."  *Hagans*, 695 F.3d at 511.

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment.  (ECF No. 67.)  Defendants are entitled to summary judgment on each of the federal claims asserted in Plaintiff's Complaint (Counts I, II, III, IV, and V).  Pursuant to 28 U.S.C. § 1367(c), the Court **DISMISSES WITHOUT PREJUDICE TO REFILING IN STATE COURT** Plaintiff's state-law claims alleged in Counts VI and VII of the Complaint.

**IT IS SO ORDERED.**

**/s/ Gregory L. Frost_____**
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**